964 A.2d 726

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

v.

**GLADWYNNE CONSTRUCTION COMPANY, et al.**

No. 2725, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 5, 2009.

William P. Pearce (Gerard P. Sunderland, Whiteford, Taylor & Preston, LLP, on brief), Baltimore, for Appellant.

Andrew H. Vance, Westminster, for Appellee.

Panel: SALMON, EYLER, DEBORAH S. and GRAEFF, JJ.

EYLER, DEBORAH S., J.

This is an unusual lost check case. In the Circuit Court for Baltimore City, Fidelity and Deposit Company of Maryland ("F & D"), the appellant, sued Gladwynne Construction Company ("Gladwynne"), Wynnewood Enterprises Limited Partnership ("Wynnewood"), and Thomas Behrle, an officer and

owner of both companies, the appellees, for breach of contract.[1] The appellees' defense was that they had paid the contract obligation by check. The case was tried to the court, which granted the appellees' motion for judgment at the close of F & D's case-in-chief.

On appeal, F & D poses one question, which we quote:

Did the trial court err in finding that a party's duty of payment under a contract is satisfied by providing the party to whom a debt is owed with a check that is not tendered for payment by the payee so that the checking account of the party having the duty to pay is never debited for the amount of such check?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

F & D filed suit on March 12, 2004, and trial was held on December 4, 2007. F & D called one witness, Jean Prem, an in-house claims lawyer, and introduced numerous documents into evidence. On cross-examination of Prem, the appellees also introduced documents into evidence. The evidence, viewed in a light most favorable to F & D, was as follows.

F & D is a commercial surety and Gladwynne is a general contractor. In 1995, F & D, as indemnitee, and Gladwynne, Wynnewood, and Behrle, as indemnitors, entered into a written indemnity agreement ("Agreement"). The Agreement became an operative part of a transaction, in 1998, whereby, at Gladwynne's request, F & D issued performance and payment bonds for a project between Gladwynne, as general contractor, and the United States Department of Veterans Affairs ("VA"), as owner ("the Project"). The Project called for Gladwynne to build a primary care clinic for Maryland's Health Care System for veterans. The VA paid Gladwynne $1,389,400 for the Project. The Project contract (No. V512(B)C–012) was exe-

---

1. F & D also set forth claims for breach of trust and common law indemnity. Those claims later were voluntarily dismissed.

cuted on October 1, 1998. On the same date, F & D issued a Performance Bond and a Payment Bond, collectively No. 08114973 ("the Bond"), both for the "penal sum" of $1,389,400.

Under the Agreement, the appellees agreed to pay F & D any sum that F & D paid out on a payment or performance bond (such as the Bond) in good faith and under the belief that it was liable for the sums and amounts so disbursed.[2]

Prem served as F & D's claims counsel for the Project. Under Prem's direction, F & D paid two claims made against the Bond: one for $57,800 and one for $3,840. F & D investigated the claims before paying them, in early 2001, and there is no dispute that F & D properly paid the claims, in good faith. Thereafter, F & D demanded that the appellees reimburse F & D, under the Agreement, for the sums paid on the two claims. In response, at some time prior to May 9, 2001, Gladwynne sent F & D two uncertified checks for the

---

2. The pertinent language of the Indemnity Agreement reads as follows:
 Contractor [Gladwynne] and Indemnitors [Wynnewood and Behrle] shall exonerate, indemnify, and keep indemnified the Surety [F & D] from and against any and all liability for losses and/or expenses of whatsoever kind ... and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence or any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety.

combined total of $61,640, in full reimbursement of the two paid claims.[3]

According to Prem, it was standard procedure at F & D for checks of the sort sent by Gladwynne to be directed to, and received and handled by, F & D's "home office," in Baltimore. Apparently, Prem was not located in the home office. She testified that the checks would have gone to the home office, not to her. She does not know what happened to them.

Prem identified F & D's Exhibit # 14 as a computer print-out from the company's internal accounting system showing, for the matter in question (*i.e.,* the payment of claims by F & D on the Project, on behalf of the appellees), a zero sum under the line for "Subrogation/Salvage." According to Prem, if F & D actually had received $61,640, that sum would have appeared as a credit on the "Subrogation/Salvage" line. Because no credit is entered on that line, F & D was not paid.

On cross-examination, Prem was questioned about an e-mail, dated May 9, 2001, that Behrle sent her, and her response. Behrle's e-mail, bearing the subject line "checks," reads: "did you find the checks we sent you? tom behrle." Prem's immediate e-mailed response was, "Yes. Thank you." Prem explained that the basis for her response would have been that she had gotten from the home office an e-mail or a fax verifying that the checks from Gladwynne had been received. (No such e-mail or fax was produced at trial, however.) She explained that she thought the "checks" referenced by Behrle were those that Gladwynne had sent to F & D in reimbursement of the paid claims.

Prem also testified that, during the course of this litigation, she did not review any bank account statements for the appellees. Thus, there was no testimony or other evidence in F & D's case about what ever happened to the checks from

---

**3.** There is some suggestion in the record that Gladwynne may have sent a single check, for the combined sum of $61,640 for both claims, but for the most part "checks," not "a check," are referenced.

All references to a "check" or "checks" in this opinion are to *uncertified checks.*

Gladwynne's point of view, *i.e.*, whether the checks ever were negotiated. Prem conceded that she had no reason to think, when the checks were received by the home office, that Gladwynne, as drawer, did not have the funds deposited in the drawee bank to cover payment, had the checks been presented for payment.

The appellees moved for judgment at the close of F & D's case-in-chief. After hearing argument of counsel, the court granted the motion, explaining, in relevant part, as follows:

> So what it comes down to is whether the action of the defendants sending the checks and the e-mail that says they [meaning F & D] received the check[s] sufficient to support opposition to Paragraph 15 [of the complaint], that they failed to indemnify. The Defendant said they did indemnify by sending the checks. I've got testimony that says the [sic] received the check, thank you for the checks.
>
> The loan [sic] argument left is that, well, it's really still not paid until F & D has the money in their accounts and the money is taken from Gladwynne's account. And I don't have an answer to that in the Plaintiff's case. And, I don't believe that it is necessary and only an affirmative defense that payment was made. I don't think that's what this was about. I'm looking a[sic] the Indemnity Agreement. I'm looking at the contract. I don't believe Plaintiff has made it's [sic] case that it needs to make. Motion is granted based on that.

This appeal followed.

## DISCUSSION

At trial, F & D's theory of liability was that, although Gladwynne sent it two checks that, in total, equaled the full reimbursement amount due F & D under the Agreement, and F & D in fact received the checks, the appellees still owe the underlying obligation because F & D never presented the checks for payment and the whereabouts of the checks are not known, *i.e.*, they are lost. The appellees' theory of defense was that their underlying obligation to reimburse F & D under the

Agreement was discharged upon F & D's receipt of the two checks covering the total reimbursement sum due, and therefore the breach of contract claim was not viable.

What is peculiar about this case, of course, is that there evidently was a delay of almost three years between F & D's losing the checks and its realizing that they were lost and, perhaps because of changes in fortune in the meantime, Gladwynne was not going to issue new checks to cover the lost ones.[4]

As we shall explain, neither party's theory of liability or defense is legally correct. Nevertheless, under the applicable law, as set forth in the Negotiable Instruments Title of the Maryland Uniform Commercial Code, Md.Code (1975, 1997 Repl.Vol.), sections 3–101, *et seq.* of the Commercial Law Article ("CL"), the appellees indeed were entitled to judgment in their favor on F & D's breach of contract claim.

As explained, Gladwynne, as drawer, issued two checks to F & D to satisfy the appellees' obligation to reimburse F & D under the Agreement. A check is a type of negotiable instrument. Specifically, as pertinent to this case, a check is "a draft, ... payable on demand and drawn on a bank." CL § 3–104(f)(i). It is in essence a direction by the drawer (here Gladwynne) to the drawee (Gladwynne's bank) to pay "to the order of" the payee (F & D) the sum stated in the check, from the drawer's (Gladwynne's) account.

The mere issuance by the drawer of a check to a payee does not effect a transfer or assignment of any sum in the drawer's account at the drawee bank. *See Ward v. Fed. Kemper Ins. Co.*, 62 Md.App. 351, 358–59, 489 A.2d 91 (1985). That only will happen when the check is presented to and accepted by the drawee bank for payment. CL § 3–408. As relevant to this case, " 'presentment' means a demand made

---

4. Ordinarily, just as a matter of good business practices, the loss of a check received by a party to a contract quickly will be determined and, when asked, the other party will stop payment and replace the check. Nothing in this opinion should be read to mean that parties cannot or should not extend that courtesy to each other.

by or on behalf of a person entitled to enforce an instrument (i) to pay the instrument to the drawee." CL § 3–501(a). Once a check is accepted by the drawee bank, the payee has the right to receive the sum stated in the check from the drawee bank. CL § 3–408.

A " '[p]erson entitled to enforce' an instrument" is defined in CL section 3–301. Pertinent to this case, a "person entitled to enforce" includes one who is not in possession of an instrument but nevertheless may enforce it under certain other provisions of the UCC. One such provision is CL section 3–309, entitled "Enforcement of lost, destroyed, or stolen instrument." It states in relevant part that a person not in possession of an instrument nevertheless is entitled to enforce it if he "was in possession of the instrument and entitled to enforce it when loss of possession occurred"; "the loss of possession was not the result of a transfer by the person or a lawful seizure"; and "the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process." CL § 3–309(a).

A person seeking to enforce a lost, destroyed, or stolen instrument "must prove the terms of the instrument and his right to enforce" it. CL § 3–309(b). Upon such proof, the person is entitled to payment as if he had presented the instrument itself. *Id.* A check "may be accepted although it has not been signed by the drawer, is otherwise incomplete, is overdue, or has been dishonored." CL § 3–409(b). A check is "overdue," *i.e.,* stale, 90 days after its date. CL § 3–304(a)(2).

■ CL section 3–310 addresses the effect of an instrument on the obligation for which the instrument is taken. Ordinarily, and for purposes of this case, if a check "is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken." CL § 3–310(b). In that situation, certain rules apply, including two pertinent here. First, suspension of the underlying obligation continues

until the check is dishonored or paid. CL § 3–310(b)(1). Second,

> [i]f the obligee is the person entitled to enforce the instrument but no longer has possession of it because it was lost, stolen, or destroyed, the obligation may not be enforced to the extent of the amount payable on the instrument, and to that extent the obligee's rights against the obligor are limited to enforcement of the instrument.

CL § 3–310(b)(4). Thus, in summary, when a check has been given to pay a debt, the debt is suspended and therefore cannot be enforced until the drawee bank has paid or declined to pay it; and such a check that has been lost, stolen, or destroyed nevertheless may be enforced by the payee and the debt remains suspended up to the amount payable on the check.

In the case at bar, F & D adduced evidence that reasonably could be understood to show that the appellees were indebted to it for $61,640 under the Agreement; that Gladwynne issued two checks totaling that full amount to pay that obligation; that F & D received the checks; that, sometime after May 9, 2001, the whereabouts of the checks became unknown; and that F & D's internal accounting records show that the company was not credited with a $61,640 payment for reimbursement on the Project.

On appeal, F & D takes the position that those facts were sufficient to show that the appellees' have not paid their obligation, under the Agreement, to reimburse F & D for $61,640, *i.e.,* to make out a *prima facie* case of breach of the Agreement. The appellees take the polar opposite position: that their obligation under the Agreement to pay $61,640 to F & D was discharged when F & D received the checks totaling that amount.

■ The appellees are incorrect in thinking that, upon receipt by F & D of the two checks from Gladwynne, their payment obligation under the Agreement was discharged up to the amount of the checks. As explained above, ordinarily, and unless otherwise agreed, the mere delivery of a check in payment of an obligation does not discharge the obligation.

CL § 3–310(b). Rather, it suspends the obligation to the extent of the amount of money equal to the amount of the check. Here, the amount of the obligation and the amount of the two checks—$61,640—were the same. The effect, therefore, of F & D's receiving the checks from Gladwynne was to *suspend* the appellees' obligation to pay the $61,640 due under the Agreement, not to *discharge* it.

 Upon receiving the two checks from the appellees, F & D should have promptly presented them to the drawee bank for payment. There was no suggestion in the evidence that the drawee bank would not have accepted the checks and honored them for payment had they been presented by F & D. Once F & D received the checks, the appellees' obligation to pay $61,640 under the Agreement was suspended. The obligation remained suspended until the checks were presented and dishonored, at which time the obligation would be taken off suspension, or until the checks were presented and honored, at which time payment would be made on the checks and the underlying obligation would be discharged. F & D's evidence showed that the whereabouts of the checks became unknown, *i.e.*, they were lost, before they were presented to the drawee bank for payment and that, according to its own internal documents, it did not receive payment from the drawee bank on the lost checks and has not been paid on the underlying obligation.

F & D's evidence also showed that the checks were received by it but then were misplaced and were never presented to the drawee bank for payment. If, by submitting affidavits with the necessary information, F & D had "presented" the lost checks, that is, attempted to enforce them although they were lost, and the drawee bank had "dishonored" them, that is, refused to accept the lost checks for payment, the appellees' underlying $61,640 obligation to F & D would have been removed from suspension, and the appellees would have liability to F & D on that obligation.[5] If F & D had "presented" the

---

5. Under Title 4 of the UCC, "Bank Deposits and Collections," a bank is not obligated to a customer having a checking account to pay a check

lost checks to the drawee bank and the bank had "honored" them, F & D would have been paid, and the underlying obligation would have been discharged. Until one of those events happened, however, the obligation remained suspended. Accordingly, when F & D sued the appellees for breach of contract based on the underlying obligation, *i.e.*, liability of the appellees to reimburse it, under the Agreement, for $61,640 paid, any such obligation was in a state of suspension, and therefore could not be enforced.

On the evidence adduced by F & D at trial, in its own case, the appellees' contractual obligation to pay F & D $61,640 was not subject to enforcement, and would not be subject to enforcement until F & D attempted to "present" the lost checks for payment to the drawee bank, and only if the drawee bank "dishonored" payment on the checks; and no such attempt to "present" the lost checks for payment had been made. As the obligation of the appellees that F & D was suing to enforce, in its breach of contract action, was suspended, the appellees could not be liable on that obligation. Because the evidence viewed in the light most favorable to F & D at trial could not support a judgment in its favor for breach of contract, the trial court properly granted the appellees' motion for judgment.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

that is presented more than six months after its date; however, the bank may do so and may charge the customer's account for a payment made more than six months after the date on the check, in good faith. CL § 4-404.

Thus, in the case at bar, had F & D sought to enforce the lost checks more than six months after the dates on the checks, the drawee bank may have dishonored them, although it was not required to, and if acting in good faith could have charged Gladwynne's account for payment on the checks.